Brinkerhoff, J.
This is a petition in error, filed in the district court, and reserved for decision here, by which it is sought to reverse a judgment of the court of common pleas. The plaintiffs in error were defendants below, and the defendant in error was plaintiff below.
The petition in the original case is very far from being a model of that clearness and conciseness of statement which the code of civil procedure prescribes, but we gather from it that the plaintiff below, "Wick, with several other parties who were owners in common with him of fractional portions of certain coal lands, on the 15th of June, 1855, executed to one Arms a lease of such coal lands, with certain mining rights and privileges therein specified, for the term of twenty-five years, giving the right of immediate possession, and recognizing the right of the lessee to assign his term under the lease.
It does not appear that Anything was done under the lease by Arms, the lessee; but on April 17, 1856, he sold and assigned the lease and term to Crawford & Murray, the plaintiffs in error, who thereby covenanted with said lessee to perform his covenants in the lease; and thereupon, Crawford & Murray went into posses- *197, 198 197] sion of the demised premises, *and continued to hold the same- and mine coal therefrom, until long after the making of the alleged verbal contract hereinafter mentioned, and on which this suit is-brought.
The petition also shows that contemporaneously with the execution of the lease to Arms, Wick alone entered into a side contract with him, which is known in these proceedings as “the store contract,” and. the stipulations of which, on the assignment of the lease by Arms to the defendants below, they agreed with him to-perform “ so far as he was bound to perform them.” This store contract, being an important element in this case, and having features so unique that I fear no synopsis could do it justice, I set out. entire, in order to a full understanding of the case, and because it. seems to me to be well deserving of such perpetual remembrance as the process of embalming in a book of law reports can confer. It is as follows:
. “This agreement, made this first day of January, A. d. 1856, by and between Charles D. Arms of the first part, and Hugh B. Wick of the other part, witnesseth :
“The said Charles D. Arms, in consideration that the said Hugh B. Wick, together with other persons, did, on the 15th day of June,. a. d. 1855, lease and rent or let unto the said C. X>. Arms certain, rights and privileges of mining, and removing stone-coal on and from what is known as the ‘Baldwin Farm’ in Youngstown, Ma-honing county, and State of Ohio (reference being hereby made to said lease and agreement), and in pursuance of an agreement to-this effect made at the time of making said lease, the said C. D.. Arms does covenant and agree with said Hugh B. Wick that he, his heirs, administrators, and assigns, will use and exert all his and their influence, in a reasonable and proper manner, to have each and all of his and their employes, laborers, and agents, and the-entire families of all such employed in any way in the mining • operations contemplated by said lease on said lands, or connected therewith, under his or their employment, do their entire trading and make all their purchase of goods, merchandise, clothing, boots,, shoes, groceries, etc., at and through the store or stores of said, 198] Wick, his heirs, administrators, *or assigns, is or may be hereafter interested in as owner or owners in whole or in part, at such store or stores, or with such person or persons, or with such firm or firms as he, the said Wick, his heirs or assigns, may at any time-direct (he or they giving said Arms, his heirs or assigns, or their-representatives, reasonable notice thereof), in the same manner- and to the same full extent as if said Arms, his heirs, administrators or assigns were at the time of such contemplated business, in *199 'terested in such store as owner or owners, in whole or in part, and to secure to such store the entire trade, patronage, and custom of all his and their employes, laborers, and agents, and their families, ■during the continuance of the aforesaid lease of June 15, 1855; and with intent, and for that purpose, the said Arms agrees and binds himself, that neither he, his heirs, administrators, nor assigns will, during the continuance of the aforesaid lease, make any agreement ■or arrangement with other store, firms, or persons, to have any of his or their employes, laborers, agents, or any of their families aforesaid, do any of their trading or mercantile business, or make any of their purchases of goods, wares, or merchandise at or with .any other store, firm, or persons than the stores, firm, or firms said Wick may be interested in, or such as he may direct as hereintofore contemplated. And the said C. D. Arms, for himself, his heirs, .administrator, and assigns, agrees that he and they will not pay or -cause to be paid, or assume to pay any debt, account, or claim any ■other store, firm, or person may have against any of his or their .aforesaid employes, agents, or families, for goods, wares, or merchandise furnished to said employes during such employment or prior thereto (than such as said Wick or his legal representatives shall direct), nor accept, receive, or pay any order or orders drawn by any such employes or agents, or their representatives, for goods, wares, or merchandise, as above mentioned, purchased by him or them of any other store, firm, or persons, nor give any such employes ■or agents any order or orders to any other store, firm, or persons, for .goods, wares, or merchandise, nor any note or other evidence of in■debtedness, in order that the same may be disposed of or transferred for goods, wares, or merchandise, contrary to the spirit of this agreement, nor purchase *any note or other evidence of indebtedness [199 given by any such employes or agents, or their families, for goods, wares, or merchandise, with intent to evade any of the stipulations herein on his or their part. But, on the contrary, he and they, the .said Arms, his heirs and assigns, will justly and fairly comply with his full and true intent and meaning of this agreement by using his or their influence, so far as the same can be reasonably and fairly -done, to have each and all of his or their aforesaid employes, laborers, agents, and their families do all their trading and business, and make all their purchases as aforesaid at and through, .and confer all their patronage and custom upon the store or stores, person or persons, as said Wick, his heirs, or assigns shall direct. .And with and for the intent and purpose aforesaid, the said Charles D. Arms, for himself, his heirs, administrators, and assigns, agrees ¡and obligates himself and theirselves that he and they will, during the continuance of the aforesaid lease, assume and pay any and all accounts, claims, and demands contracted by any of such employes, laborers, agents, or their families, at the store said Wick, his heirs, <or assigns may be interested, or such person or persons as said Wick, his heirs, or assigns may be interested, or such person or *200 persons as said Wick, his heirs, or assigns may direct, to then amount equal to the same earned by such employes, laborers, or agents in such employment for said Arms, his heirs, administi’afcors, or assigns. But if any such employes, laborers, or agents shall dispute the correctness of any such account or claim before mentioned, the same is to be settled and determined by the person or-persons to whom the same is due, without charge or loss to said Arms, his heirs, administrators, or assigns. And if said Arms, his-heirs, administrators, or assigns shall refuse to pay any of his or-their employes, laborers, or agents, by reason of any such dispute as to the correctness of such amount, said Wick agrees that he or the person having such account or claim will pay all cost, charges,, and loss occasioned by any litigation arising therefrom, so as to-save said Arms, his heirs, administrators, or assigns harmless by reason of anj^ such litigation; and in order to the proper settlement of all such accounts and claims and the payment thereof by 200] said Charles D. Arms, his *heirs, administrators, and assigns, it is further agreed that said Arms, his heirs, administrators, and assigns will render monthly, to such store or person or persons as-said Wick, his heirs, administrators, or assigns shall direct, a full statement of all the accounts, with any and all his or their employes, laborers, agents, and their families. And it is further-agreed that for each and every violation by said Arms, his heirs, administrators, or assigns of any of the stipulations herein, on his- or their part, he or they will pay, and are bound to pay, said Wick, his heirs, administrators, or assigns, a sum not less than five dollars-as liquidated damages and cost.
“In witness whereof, we, the contracting parties, have hereunto-set our hands and seals, year and date above written.
“ Charles D. Arms.
“ Hugh B. Wick.
“ In presence of
'“Lemuel J. Wick.”
Such being the contract relations of the parties, and Crawford & Murray having, as is alleged, become delinquent in the performance of the stipulations of the lease on their part, and having-failed to influence the trade and patronage of their employes in-accordance with their obligations assumed under the store contract, and Wick threatening to exact and enforce a forfeiture of their-term under the lease, and having taken preliminary steps to that end, and claiming damages for their failui’e to fulfill “the store contract,” the parties, in March, 1858, mot together and entered into the parol contract on which the original action in this case-was brought, and which was in substance this:
*201 In consideration that "Wick would forbear to enforce the forfeiture of the lease against the plaintiffs in error, and would permit, them to continue to occupy and work the demised premises'in accordance with the terms of the original lease, and would relinquish his claim for damages on account of their non-performance of the stipulations of the store contract, Crawford & Murray agree to pay him three cents per ton on all -coal already mined, and four cents per ton on all coal thereafter to be mined under said lease, in addition to the payments ^stipulated for in the lease; and this [201 not only on Wick’s share of the coal mined, and to be mined, but also on the shares of the other owners of the leased premises in common with him, who were not parties to this parol contract. The non-payment of the three and four cents per ton thus agreed to bo paid, and also the non-performance of certain stipulations of the original lease, are the breaches assigned; and on the ground of which a judgment for damages is prayed.
The defendants below demurred generally to the petition. The demurrer was overruled, and the defendants below answered, denying any delinquency by them in the performance of the coveenants of the original lease by which any forfeiture by thorn was incurred, denying that Wick had taken the proper steps to forfeit the same, denying the making by them of the parol contract alleged in the petition, and their liability to pay the said three and four cents per ton, as claimed by him.
The ease was tried to a jury, and Wick had a verdict for $6,712.42. The defendants below moved for a new trial on the grounds, inter alia, that the court had erred in various rulings as to the admissibility of evidence, in its charge as given to the jury, in refusing to charge as requested by defendants below, and that the verdict was not sustained by sufficient evidence.
The motion for a new trial was overruled, and judgment was rendered on the verdict. Thereupon a bill of exceptions was taken embodying the various rulings of the court upon the trial, its charge as given, its refusal to charge as requested, and all the evidence in the case. The defendants below now make, by their assignments of error, substantially the same points made by them on their motion for a new trial below.
On the argument of the case in this court counsel have made and elaborately argued numerous questions which-we do not find it necessary to consider, or even to notice.
*202 We are of opinion that on tbe case made by the pleadings and evidence the plaintiff below was not entitled to recover ; and that the court of common pleas erred in overruling the motion for a new trial; and this for two reasons :
202]* *1. The contract on which the action was brought, not being in writing, was clearly within the statute of frauds. It was a contract for an interest in lands and tenements ; for a right to use, occupy, and enjoy lands and tenements; to mine coal within and upon them, and to pay rent for them; and there was no such performance of the contract as to take it out of the operation of the statute. The evidence shows that Wick, on his part, did simply nothing. He ceased to threaten to exact a forfeiture of the original lease, and took no further steps to enforce such forfeiture; while •Crawford & Murray, on their part, continued to pay, and Wick to receive, the rents stipulated for in the orginal lease ond no more, all the time up to the final surrender of the term by Crawford & Murray and the acceptance of the surrender by Wick. Crawford .& Murray did not yield up possession of the demised premises at •or about the time of the making of the alleged parol contract, but, for years afterward, continued to occupy them right on wlthoru. visible change; the possession of the demised premises was continuous and unbroken, and is referable as well to the old, as to the new or supplemental lease. The case of Armstrong v. Kattenhorn 11 Ohio, 265, is very closely analogous to the present case, so far as this question is concerned, and is conclusive of it. It is there •decided, that “ a tenant in possession, in case of a parol agreement for different terms of holding, if no acts are performed which •clearly show that the possession is continued under the last agreement, it will be referred to the original tenancy, and such parol ■contract will be void.”
2. Because the court below erred in recognizing, as it did, both, in its charge to the jury as given, and in refusing to charge as .asked, the relinquishment by Wick of a claim of damages for the non-performance of the stipulations of the store contract, as being .a valid consideration for the contract sued on. The contract sued on rested, as is alleged in the petition, on two items of consideration, to wit, forbearance to exact a forfeiture of the old lease, and the claim for damages under the store contract. But if the store contract was fatally tainted with illegality and wholly void, then *203, 204 mo valid *claim of damages for its breach could exist to [203 .constitute a consideration for a new contract.
This much being premised, let us look into this store contract, und at the principles of law bearing upon it. It is an elementary doctrine, that contracts in general restraint of trade are unlawful, and therefore void; though as a general rule, agreements which ••stipulate only for a partial or particular restraint, are recognized ;as valid. Metcalf on Contracts, 232. To this latter general rule, however, there is an important exception which must not be overlooked ; and which is thus stated in a book of high and venerable authority. “ Whatsoever a man may lawfully forbear, that he may •oblige himself against; except where a third person is wronged, or the public is prejudiced by it.” C. J. Wilmot’s Opinions, Low v. Peers, 377. And the learned chief justice adds, in treating of this ■.subject, on the next page, “ It is the duty of all courts of justice to keep their eye steadily upon the interest of the public, even in the .administration of commutative justice; and when they find an action is founded upon a claim injurious to the public, and which has a bad tendency, to give it no countenance or assistance in foro civili.’” Now, in the light of these principles, retaining our common sense in its integrity, and not allowing our vision to be obscured by so flimsy a veil as that which is attempted to be cast over the provisions of this contract by the use of the fair-seeming phrases, “in a reasonable and proper manner ”• — ■“ so far as the same can be reasonably and fairly done ” — and the like, let us look into some of the particular provisions of this store contract; into its .general scope and tendency, and into the character and aims of the scheme which it embodies, organizes and discloses.
Selecting, now, a single gem from the casket of precious things, we hold it up to the light. Here it is. The lessees agree that they will not “ accept, receive, or pay any order or orders drawn by any of” their “ employes or agents, or their representatives, for goods, wares or merchandise, • • • purchased by him or them •of any other store, firm, or persons, nor give any such employes or agents any order or orders to any other store, firm, or persons, for goods, wares, or merchandise, *or any note of other evi- [204 dence of indebtedness, in order that the same may be disposed of •or transferred for goods, wares, or merchandise, contrary to the spirit of this agreement,” etc. Now, throwing over these stipulations a mantle of charity broad enough to cover a multitude of *205 sins, and with a webb thick and dense enough to conceal from our flight their otherwise obvious intention, what is their tendency, and what would be their probable practical operation ? A lessee of a coal-mine who submits to a contract, the terms of which are so repulsive and degrading to himself, may well bo supposed to be far from independent on the score of pecuniary means; and the last stipulation in the above extract from the contract presupposes that he will become indebted to his workmen, and hence be obliged to give them “ notes or other evidences of indebtedness,” to be by them transferred for personal and family necessaries. Suppose such a case to occur. The lessee becomes indebted to his workmen. Perhaps the mine has not yet become productive, or the means of transportation are not obtainable, or the market for coal happens to be glutted. The workmen want provisions and clothing for themselves and families, and the notes of their employer to be negotiated in exchange for these necessaries; and these they can have, but in such a way only as to hedge them out from the benefit of competition among shopkeepers. They must take their notes to the store of Wick, and trust to his sensitive conscience and regard for fair and just dealing, first, as to the amount of discount they must allow him on their notes transferred to him, and second, as to prices ho will exact for the goods they receive in exchange. Again, the terms of the contract presupposes, and assuredly it is no violent presumption, that circumstances may exist which will render it necessary for the workman to anticipate his wages. Suppose such a case. Sorely needed wages are not yet earned. Perhaps he is ill, and has to await the return of health to earn them. At all events, pay-day is yet in the future. He goes or sends around among the retail shoj>s, and being known as one of Crawford & Murray’s coal diggers, he finds that, for some inexplicable reason, prices of needed articles are 205] high at Wick’s, while at other shops they are ^comparatively low. The simple soul prefers to deal with some one of the latter. He goes to its proprietor, states his situation and necessities, and proposes the purchase of certain necessaries, and for the price of them to give an order on his employer to be paid out of his wages when they accrue. The shopkeeper answers, “ Yes, you can have-what you need at the regular prices named, provided your employer will accept your order. Call again to-morrow, and in the-meantime I will see him and so be able to give you an answer.’* *206 Accordingly, on the next day, he calls again, and is told that his-employer says that he is under a contract to accept no order from a workman unless it be given on Mr. Wick. And so he too is-turned over to the alternative of either doing without the things-which he needs, or of subjecting himself to the tender mercies of “ the party of the other part ” to the store contract.
Having thus, in the most moderate colors which my estimate of the character and tendency of this store contract permits, endeavored to. depict one of its characteristic features, I place it side by side with the time-honored principles announced by Chief Justice Wilmot, and submit it to the ordeal of those principles: “Whatsoever a man may lawfully forbear, that he may oblige himself against; except where a third person is wronged, or the public is prejudiced by it.” “It is the duty of all courts of justice to keep their eye steadily upon the interest of the public, even in the administration of commutative justice; and when they find an action is-founded upon a claim injurious to the public, and which has a lad tendency, to give it no countenance or assistance in ‘foro civili.’ ”
A majority of the court are of opinion that the particular segment of the store contract above commented on, being in restraint of trade, and naturally tending in its practical operation to inflict wrong, disadvantage and suffering upon third persons, is-unlawful; and being in its character inseparable from the other-provisions of the contract, it taints the' whole. Met. 216, 247; 11 Wheat. 258.
I have invited special attention to that portion of the store contract above remarked upon, not because I regard the legal *or [206 moral character, or the practical tendency of that portion of the contract as being exceptional, when compared with its other provisions, or with the contract as a whole, but rather by way of illustration of the character and tendency of the whole scheme which the contract embodies, organizes, and discloses. It 'is but one of a litter, in which the family resemblance, apparent in the aspect of all, sufficiently establishes a common parentage, and precludes the hypothesis of a case of superfetation by a plurality of sires.
It is said in Bacon’s Abridgment, vol. 2, p. 299, that “ as to bonds entered into in restraint of trade, it seems to have been always admitted, and hath been frequently adjudged, that a bond restraining trade in general, as that a person shall not follow such a trade in any part of the kingdom, is void; the reasons whereof are that such bond *207 tends to a monoply, and is against the public good; deprives the party of his means of livelihood; enables masters to lay hardships upon their servants” and “apprentices; tends to.oppression,” etc. And so, on the next page it is added, “if the condition of a bond is that the obligor shall not buy any sheeps-trotters of any person of whom the obligee had bought or should buy, this is .void, being a. restraint of trade, and tending to a monoply.”
The majority of the court are of opinion, that viewing this store ■contract as a whole, and the scheme which it embodies, it comes ■clearly within the reasons thus stated, on the ground of which it is the policy of the law to avoid certain contracts, and to overthrow every superstructure which is reared upon them as a foundation. It tends to restrain trade in a manner operating naturally and .almost inevitably to the injury of others; it tends to unwaiTantable monoply, to extortion, and to the depriving of the hireling of the full benefit of his wages when earned, and of the benefit of such legitimate credit as he might have on the basis of wages to be earned.
I have not been able to find any direct precedent for holding that ■.a contract whereby the influence of an employer over his employes is sold to, and for the benefit of a third person, is void; nor have I been able to find any to the contrary. But knowing, as we do, that the relation of employer and employe is, to a great extent, one 207] of mutual dependence, *but a dependence generally preponderating in favor of the employer and against the employe; and when it is easy to see that in the fast-coming future, as manufacturing and mining operations aro enlarged and multiplied, as population becomes more dense, and the labor market becomes more and more choked by the increasing number of competing hands for its employ, the dependence of the laborer on his employer will become greater and more influential, I can not but think, and, speaking for myself alone, I must say that such ought to be the law; and it seems to me that such a case would come clearly enough within the scope of principles already established to warrant a court, governed by a just and forecasting judicial policy, in declaring that a contract for the sale of an employer’s influence over his employes, in respect to matters of trade, is in itself alone so liable to abuse, so dangerous in its tendency, and so likely to tempt hard, grasping, and greedy men to the easy practice ■of extortion and oppression upon a dependent class, as, in the *208 language of Chief Justice Wilmot, to forbid its receiving either “countenance or assistance in foro civili.”
The store contract, then, being wholly unlawful and void, the giving up of a claim of damages for a breach-of its stipulations furnished no consideration for any new contract. And in so far as such relinquishment of claim entered into and constituted the-basis of the contract sued on, so far, to say the least of it, the-latter was without consideration; and the court below erred in refusing so to charge the jury, and in its distinct recognition of the-validity of the store contract in its charge as given.
Judgment reversed, new trial awarded, and cause remanded to-the common pleas.
Day, C. J., and Welch and White, JJ., concurred.